In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-3836, 98-3912 & 99-1429

Robert MacDonald, Caren C. Thomas
and Windy City Hemp Development Board,

Plaintiffs-Appellees,
Cross-Appellants,

v.

City of Chicago,
Defendant-Appellant,

Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 5266--David H. Coar, Judge.

Argued January 20, 2000--Decided March 12, 2001

Before Coffey, Manion, and Rovner, Circuit Judges.

Manion, Circuit Judge.  Robert MacDonald sued the
City of Chicago seeking a declaration that the
city's ordinance permitting parades violates the
First Amendment, and a permanent injunction
barring its enforcement. The district court
concluded that although the ordinance did not
provide the City with unlawful discretion to deny
permits, it was unconstitutional because it
lacked the procedural safeguards set forth in
Freedman v. Maryland, 380 U.S. 51 (1965).
Accordingly, the district court enjoined
enforcement of the ordinance. The City of Chicago
appealed. MacDonald filed a cross-appeal,
challenging the district court's conclusion that
the ordinance did not grant the City
unconstitutional discretion.

While the appeal was pending, the City of
Chicago amended the ordinance, and then it filed
a Rule 60(b)(5) motion in the district court
asking the court to vacate its injunction. The
district court denied the motion to vacate,
concluding that the amendments to the ordinance
did not cure the constitutional defects. The City
of Chicago appealed from that decision, and we
consolidated both appeals. We also granted Caren
Cronk Thomas and the Windy City Hemp Development
Board leave to substitute as plaintiff-
appellees/cross-appellants in the place of Robert
MacDonald, who had since died./1 We now conclude

that the ordinance does not provide the City with unconstitutional discretion to review parade-permit applications. We further conclude that the ordinance is a valid time, place, and manner restriction, and that the ordinance's challenged procedural safeguards are constitutional. Therefore, we REVERSE the district court's declaration that the ordinance is an unconstitutional prior restraint of speech.

I.  Background

Robert MacDonald was a vocal advocate for the legalization of marijuana. In order to spread his message, MacDonald organized various events, including marches and political rallies. In June 1997, MacDonald applied for a parade permit pursuant to Chicago Ordinance 10-8-330(b), which requires anyone who plans to conduct a parade on any public street or sidewalk to obtain a permit from the Commissioner of the Chicago Department of Transportation ("Commissioner"). In his application, MacDonald requested a permit to hold a march on August 23, 1997 in downtown Chicago, marching through the "Loop,/2" up Michigan Avenue to Chicago Avenue, returning south along Michigan Avenue to the Loop. The parade was to be held in conjunction with a political rally in Grant Park, which was the subject of another lawsuit. MacDonald v. Chicago Park Dist., 132 F.3d 355 (7th Cir. 1997) (denying MacDonald's request for a preliminary injunction preventing the park district from denying requests for park permits).

The Commissioner denied MacDonald's application for a parade permit, concluding that:

The proposed activity will substantially and unnecessarily interfere with traffic; there are not available a sufficient number of peace officers to police and protect participants; and the concentration of things at the assembly and along the route will prevent proper fire and police protection and ambulance service.

The Commissioner's cited justifications derive from other portions of Chicago's ordinance, particularly subsection (h), which requires the Commissioner to issue a parade permit when he finds that:

The proposed activity will not substantially or unnecessarily interfere with traffic in the area contiguous to the route;

There are available at the time of the parade, public assembly or athletic event a sufficient number of peace officers to police and protect lawful participants in the activity;

The concentration of persons, animals, vehicles, or things at the assembly and disbanding areas and along the parade or athletic event route will not prevent proper fire and police protection or ambulance service;

Chicago Ordinance, sec. 10-8-330(h).

After the Commissioner denied MacDonald's parade-permit application, MacDonald filed a verified complaint seeking declaratory and injunctive relief against the City of Chicago; his complaint, brought pursuant to 28 U.S.C. sec. 1983, alleged a facial challenge to portions of the City's parade permitting ordinance, claiming violations of the First Amendment. After full briefing on MacDonald's motion for a preliminary injunction, the parties reached an agreement allowing MacDonald to conduct a more limited parade than the one he originally sought. The district court then denied the motion for a preliminary injunction as moot.

But the dispute did not end there. On January 8, 1998, MacDonald applied for a parade permit to conduct a parade on May 9, 1998 at 11:00 a.m. following a route virtually identical to the one he had applied for in August 1997. The Commissioner denied this application for the same reasons he denied MacDonald's first application, but the Commissioner also suggested an alternative parade route. MacDonald apparently was not satisfied with the proposed alternate route, and he again requested a preliminary injunction. The parties, however, once more settled their differences, and MacDonald withdrew his request for preliminary relief.

The district court then considered the parties' cross-motions for summary judgment on the merits of MacDonald's First Amendment claim for declaratory and permanent injunctive relief. The district court concluded that Chicago Ordinance 10-8-330 violated the First Amendment because, even though it did not confer upon the Commissioner unfettered discretion, it required the Commissioner to consider whether a sufficient number of police officers would be available to protect the participants, and this, the court believed, required the Commissioner to consider the content of the marchers' speech. Accordingly, the district court concluded that the ordinance was an unconstitutional content-based regulation of speech. The district court further held that the ordinance constituted a prior restraint, and as such must include the three constitutional safeguards set forth by the Supreme Court in Freedman v. Maryland, 380 U.S. 51 (1965), the third of which required the censor to bear the

burden of going to court to suppress the speech and to bear the burden of proof once in court. The district court concluded that because the Commissioner did not bear those burdens, Chicago Ordinance 10-8-330 constituted an unconstitutional prior restraint. The district court then permanently enjoined enforcement of Section 10-8-330.

The City of Chicago appealed from the district court's decision, and MacDonald cross-appealed from the district court's conclusion that Section 10-8-330 did not provide the City of Chicago with unconstitutional discretion. After filing its notice of appeal, the City of Chicago also amended its ordinance, and then requested the district court to vacate its injunction pursuant to Rule 60(b)(5). The district court concluded that the amendments to the ordinance did not alter the result. The City of Chicago appealed from that decision, and we consolidated both appeals. We also granted Caren Cronk Thomas and the Windy City Hemp Development Board leave to substitute as plaintiff-appellees/cross-appellants because MacDonald had since died. See supra at 2.

II. Analysis

We review de novo decisions on summary judgment as we do questions of constitutional law. Stokes v. City of Madison, 930 F.2d 1163, 1168 (7th Cir. 1991) ("All First Amendment issues, save the district court's acceptance of stipulated facts, we review de novo."). However, before considering the constitutionality of Chicago Ordinance 10-8-330, we must initially consider which version of the ordinance is properly before us: MacDonald argues that we should consider the constitutionality of both the ordinance in effect at the time he filed suit and the current version; whereas the City contends that any dispute over the original ordinance has been mooted by its subsequent modifications, and thus we should consider only the constitutionality of the modified ordinance./3

We agree with the City that the new ordinance is the only one before us on review. Any dispute over the 1997 version of the ordinance was mooted by the enactment of the new ordinance. Kremens v. Bartley, 431 U.S. 119, 129 (1977) ("[T]he enactment of the new statute clearly moots the claims of the named appellees."). But even as revised, the ordinance as interpreted by the district court continues to impact the plaintiffs. Thus, since a case or controversy remains, we will consider the constitutionality of Chicago's parade permitting ordinance as it now stands. Fusari v. Steinberg, 419 U.S. 379,

387 (1975) (holding that in considering the constitutionality of the challenged law, "[t]his Court must review the District Court's judgment in light of presently existing Connecticut law, not the law in effect at the time that judgment was rendered."). See, e.g., 11126 Baltimore Blvd., Inc. v. Prince George's County, Md., 58 F.3d 988, 991-92 (4th Cir. 1995) (reviewing only the constitutionality of the current version of the zoning ordinance, notwithstanding County's assertion that it intended to return to its prior ordinance if the court upheld the constitutionality of the previous version).

According to MacDonald, as it now stands, Chicago's parade permitting ordinance still violates his First Amendment rights. Without question, MacDonald's parade and rally in support of the use and legalization of marijuana is speech protected by the First Amendment of the United States Constitution. Although he has the right to demonstrate and speak freely on this issue, that right does not allow him and other participants to create chaos by disrupting traffic, impeding pedestrians, endangering themselves or other people, and otherwise causing gridlock on the busy streets and sidewalks of the city of Chicago. At the same time, the City has an obligation not only to permit MacDonald and other participants to engage in the parade and rally, but it is also obliged to protect the participants, to ensure their safety and that of others in the area, to maintain an orderly flow of traffic, and to prevent disruptive or even violent confrontations. To meet this obligation, the City must have sufficient police officers available to see to it that the parade proceeds in an orderly fashion along a pre-designated route in order to allow the demonstrators to exercise their speech rights while the City continues to function and non-participants go about their normal business.

But balancing these rights and obligations is no simple task. The courts have been embroiled in First Amendment challenges for decades. The resulting case law is complicated to say the least. The Supreme Court has issued a number of split decisions and various circuits have taken divergent paths in resolving the conflicts between the free speech rights of individuals and the obligation of government officials to maintain order and even-handed protection among its citizens. In the continuing examination, we are now faced with yet another challenge in which we must apply the present facts to the constitutional law as it now stands. To do so, we must consider the specific constitutional challenges presented by MacDonald, and the City's response.

MacDonald first argues that Section 10-8-330 unconstitutionally vests the Commissioner with unfettered discretion to grant or deny a parade permit. Second, MacDonald asserts that the ordinance is a prior restraint on speech and therefore must guarantee prompt judicial review, which it does not. Finally, MacDonald argues that as a prior restraint, the ordinance must also place the burden to seek judicial review of any permit denial on the City, but it does not. Conversely, the City of Chicago argues that its parade-permitting ordinance does not confer on the Commissioner unlimited discretion, and that it is not a prior restraint of speech, but rather a valid time, place, and manner restriction.

A.  Unfettered Discretion?

It is well established that where a statute or ordinance vests the government with virtually unlimited authority to grant or deny a permit, that law violates the First Amendment's guarantee of free speech. See Saia v. People of State of New York, 334 U.S. 558, 559-60 (1948) (city ordinance prohibiting use of sound amplification devices, except with permission obtained from chief of police, is invalid as infringing right of free speech, in absence of any standards prescribed for exercise by chief of police of his discretion); City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750 (1988) (licensing scheme which gives the government unlimited discretion is facially unconstitutional). As we have reiterated, where virtually unlimited discretion exists, "the possibility is too great that it will be exercised in order to suppress disfavored speech." MacDonald v. Chicago Park Dist., 132 F.3d 355, 361 n.6 (7th Cir. 1997) (citing Lakewood, 486 U.S. at 757-58).

MacDonald argues that Chicago Ordinance 10-8-330(h) confers on the Commissioner unfettered discretion to approve or deny parade-permit applications, and thus it violates the First Amendment. For instance, MacDonald points to the ordinance's requirements that the Commissioner consider whether the proposed parade will "substantially or unnecessarily interfere with traffic in the area contiguous to the route," whether there are available "sufficient city resources to mitigate the disruption," whether there are available "a sufficient number of peace officers to police and protect lawful participants and non-participants from traffic related hazards in light of the other demands for police protection," and whether the concentration of persons will "prevent proper fire and police protection or ambulance service." He then queries the court, "What are 'substantially,'

'unnecessarily' and 'sufficient'?" He argues that this loose language leaves the Commissioner with complete discretionary authority to grant or deny a parade permit, and therefore the ordinance is unconstitutional.

In support of his position, MacDonald cites several Supreme Court cases, such as Shuttlesworth v. City of Birmingham, Ala., 394 U.S. 147 (1969). In Shuttlesworth the Court considered the constitutionality of a Birmingham ordinance that required the city commission to issue a parade permit unless in "its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience required that it be refused." Id. at 149-50. The Court struck the ordinance because it unconstitutionally conferred the government with unbridled discretion. Similarly in Schneider v. State of New Jersey, Town of Irvington, 308 U.S. 147 (1939), the Court struck down a municipal ordinance which allowed the Chief of Police to deny a permit to door-to-door solicitors if he determined the speaker was "not of good character." In Staub v. City of Baxley, 355 U.S. 313 (1958), the Court likewise invalidated a city ordinance because of the unfettered discretion granted the decisionmaker. Id. at 321. In that case the mayor could deny permits to applicants requesting permission to solicit others to join their organization based on the "character of the applicant, the nature of the business of the organization for which members are desired to be solicited, and its effects upon the general welfare of citizens of the City of Baxley." Id.

But as the district court correctly noted, "[i]n contrast to the obscure standards in the cases cited above, the provisions of sec. 10-8-330(h)(1)-(4) specify legitimate safety concerns in as precise a manner as such concerns can reasonably be articulated." D.Ct. Opn. at 13. Moreover, as the district court further reasoned, in terms of the type of "discretion" that it confers, sec. 10-8-330 is more analogous to other ordinances that have been upheld in this circuit. Specifically, in Graff v. City of Chicago, 9 F.3d 1309 (7th Cir. 1993), this court considered en banc whether a Chicago ordinance which contained six criteria for determining whether to grant a license application for a newsstand unconstitutionally conferred unlimited discretion on the designated city officials. Among the six criteria, city officials were required to consider "[w]hether the design, materials and color scheme of the newspaper stand comport with and enhance the quality and character of the streetscape, including nearby development and existing land uses" and "the extent to which services that would be offered by the newspaper

stand are already available in the area." Id. at 1317-18 (quoting Chicago Mun. Code sec. 1028-160(a)). The ordinance further empowered city officials to "remove a newsstand that 'endangers public safety or property,'" that "interferes with or impedes the flow of pedestrian or vehicular traffic," or that is placed "in such a manner as to impede or interfere with the reasonable use of [a display window.]" Id. at 1319 (quoting Chicago Mun. Code sec.10-28158(a) & (b)).

Notwithstanding the flexibility in the above quoted criteria, a majority of the Graff court concluded that the ordinance did not provide the decisionmaker with such unfettered discretion that it offended the First Amendment. Id. at 1317-18; id. at 1329 (Flaum, J., concurring) (noting that while the enumerated factors allow flexibility, they are "the kinds of legitimate concerns one would expect a city to weigh when deciding how to allocate limited public space in a neutral way."); id. at 1335 (Ripple, J., concurring) ("In no way does the ordinance place unfettered discretion in the hands of city officials."). In fact, this court recently made this same point in another case involving MacDonald: "nine of twelve judges on the en banc court [in Graff] concluded that [that] ordinance was sufficiently objective and specific to limit the decisionmaker's discretion and thereby to survive a facial First Amendment challenge." MacDonald v. Chicago Park Dist., 132 F.3d 355, 361 (7th Cir. 1997) (citing Graff, 9 F.3d at 1318, 1329, 1335).

Section 10-8-330 more closely resembles the ordinance at issue in Graff than those rejected in Schnieder, Staub, and Shuttlesworth. Like the Graff ordinance, Section 10-8-330 specifically and narrowly identifies the reasonable and necessary governmental concerns--traffic flows, traffic hazards, and emergency transportation. Moreover, to the extent that Section 10-8-330 provides flexibility for the Commissioner's evaluation of those concerns with the use of such words as "substantially," "unnecessarily," and "sufficient," this actually provides an additional limitation on the government's discretion, as compared to that contained in the ordinance in Graff; there, the ordinance allowed City officials to remove a newsstand if it "endangers public safety or property," or "interferes with or impedes the flow of pedestrian or vehicular traffic," but the ordinance did not provide officials with any threshold of harm. Yet, a majority of this court found the ordinance in Graff sufficiently precise so as to conclude that it did not provide the City with unconstitutionally unfettered

discretion. Graff, 9 F.3d at 1317-18; id. at 1329 (Flaum, J., concurring); id. at 1335 (Ripple, J., concurring). See also, Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989) ("While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."); United States v. Kistner, 68 F.3d 218, 221 (8th Cir. 1995) (park permit regulation that required consideration of "peace and tranquility," public health and safety, and potential for damage to park resources and facilities, did not unconstitutionally vest government with unbridled discretion).

Similarly, while Chicago's ordinance provides some flexibility, it limits the Commissioner's discretion by requiring the Commissioner to grant a parade permit, unless specifically articulated public-safety concerns exist. And the public-safety concerns contained in the Ordinance closely resemble the type of factors approved of in Graff. For instance, in Graff city officials had discretion to consider whether the newsstand "interfere[d] with or impede[d] the flow of pedestrian or vehicular traffic," while here the Commissioner considers whether the parade "unnecessarily interfere[s] with traffic in the area contiguous to the route." While the other factors set forth in Section 10-8-330 differ in type from those approved of in Graff, they are of the same nature, and similarly limit the Commissioner's discretion.

More recently, this court considered the constitutionality of a closely analogous Chicago ordinance--one covering park permits. In Thomas v. Chicago Park Dist., 227 F.3d 921 (7th Cir. 2000), the same plaintiffs as involved in this case presented a facial challenge to the City of Chicago's regulations which govern the use of parks, and which require a permit for an assembly, parade, demonstration, sporting event, or other use of the park by a group of 50 or more persons. Chi. Park Dist. Code ch. VII. In that case, the plaintiffs claimed, among other things, that the ordinance provided the City with unconstitutional discretion. In support of their position, the plaintiffs cited various sections of the ordinance, including a provision allowing the City to deny a permit if the applicant "has on prior occasions made material misrepresentations regarding the nature or scope of any event or activity previously permitted." The plaintiffs also pointed to a provision that provided that "the park district 'may' deny a permit because of a misrepresentation, the failure to tender the fee, having damaged

property of the park district on a previous occasion, or other grounds listed in the regulation, . . . ." Notwithstanding the flexibility of words such as "material" and "misrepresentations," and the discretion provided the park district with the word "may," this court rejected the plaintiffs' contention that these provisions unconstitutionally vested the City of Chicago with too much discretion. In doing so, this court noted that words such as "material" actually restricted the limitation on the City's discretion. Thomas also observed the difficulty in defining more specifically the factors to be considered given the various competing interests at play. Id. at 925 ("The plaintiffs complain that this is vague, but do not indicate how it could be made less vague yet encompass the myriad activities that the First Amendment has been held to protect.").

The ordinance at issue in this case closely resembles the park-permit ordinance upheld in Thomas. While both ordinances included language providing city officials with flexibility in assessing the proposed activity, the flexibility is no more than is necessary so as to allow the city officials to balance the competing interests at issue. Therefore, based on Graff, and more recently Thomas, we conclude that Section 10-8-330 sufficiently articulates definitive standards on which the Commissioner must base his decision concerning a parade application to withstand constitutional scrutiny.

B. Prior Restraint or Time, Place and Manner Restriction?

MacDonald next argues that Section 10-8-330 constitutes a prior restraint on speech and thus must provide certain procedural protections, which according to MacDonald, it does not. On the other hand, the City of Chicago argues that Section 10-8-330 merely regulates the time, place and manner of speech, and as such is not a prior restraint on speech.

Both parties find support in Supreme Court decisions. The City of Chicago cites Cox v. State of New Hampshire, 312 U.S. 569 (1941), wherein the Court considered the constitutionality of a law requiring the issuance of a permit before marchers could occupy public ways. As the City correctly notes, the Court in Cox did not characterize that law as a "prior restraint," but rather upheld the law as a reasonable regulation of the "time, place, and manner in relation to the other proper uses of streets." Id. at 576. See also Clark v. Community for Creative Non-Violence, 468 U.S. 288 (1984). But MacDonald counters with FW/PBS, Inc. v. City of Dallas, 493

U.S. 215 (1990), Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992), and City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750 (1988), wherein the Supreme Court analyzed licensing and permit regulations as "prior restraints," rather than as time, place and manner regulations.

The lead opinion in Graff (an en banc case with a five-judge plurality, with two concurrences involving four judges, and a dissent involving three judges) did not find it necessary to reconcile these seemingly contradictory precedents. Although the five-judge Graff plurality concluded that the regulation of a newsstand did not implicate the First Amendment, in the alternative, it concluded that even if it did, it was a constitutionally appropriate time, place and manner restriction, and the procedural safeguards provided were sufficient.

In his concurrence in Graff, which two other judges joined, Judge Ripple aptly synthesized the competing precedents. Accordingly, it is appropriate to incorporate that thorough analysis here in this case which indisputably implicates the First Amendment. Compare, Graff, 9 F.3d at 1313 ("Graff has no First Amendment right to build a structure on public property.").

As Judge Ripple explained:

For a very long time the Supreme Court has had to deal with even-handed attempts to regulate the exercise of expression in public forums. Parade or demonstration permits are the usual context in which these cases have arisen. The Court has evaluated such attempts by governments to bring order to the public forum under what is commonly known as time, place, or manner analysis. See Clark v. Community for Creative Non-Violence, 468 U.S. 288 (1984). . . . see also Cox v. New Hampshire, 312 U.S. 569, 576 (1941).

Id. at 1334.

But, as Judge Ripple further explained, FW/PBS and Lakewood
appl[ied] prior restraint analysis to fact situations that are the functional equivalent of those situations that the Court had analyzed traditionally under the time, place, and manner analysis. Specifically, in Lakewood, the Court struck down as facially invalid an ordinance requiring a license to place newspaper dispensing machines on the city streets. Similarly, in FW/PBS, the Court struck down parts of an ordinance requiring the licensing of adult businesses. In both cases, the Court characterized the restriction imposed by the

ordinance as a prior restraint and determined
that its failure to comply with the stringent
mandate of Freedman v. Maryland, 380 U.S. 51
(1965), rendered the ordinance unconstitutional.

Id.

   Why then did the Court not "follow its usual
approach of treating factual situations such as
these as susceptible to time, place, and manner
analysis and instead employ[ed] prior restraint
analysis"? Id. As reasoned in Judge Ripple's
concurrence,

[w]hat distinguishes the Court's treatment of
licensing schemes in these two sets of cases is
the presence of unfettered discretion. In both
Cox and Clark, the Court dealt with the
administration of an ordinance or regulation
which proscribed the activity of the licensing
authority. In fact, the Cox Court distinguished
those cases in which government officials were
unrestrained in their power to grant or deny
permits. 312 U.S. at 577. In both Lakewood and
FW/PBS, however, there was unfettered discretion
to grant or deny the license in Lakewood pursuant
to the very language of the ordinance and in
FW/PBS pursuant to the way the licensing official
could delay the licensing decision, presumably
indefinitely. This type of discretion, in the
Court's eyes, "gives a government official or
agency substantial power to discriminate based on
the content or viewpoint of speech by suppressing
disfavored speech or disliked speakers."
Lakewood, 486 U.S. at 759. It also presents the
possibility of self-censorship. Id. Because of
these concerns, the Court in Lakewood struck down
the ordinance absent "neutral criteria to insure
that the licensing decision is not based on the
content," id. at 760, and, in FW/PBS, struck down
the ordinance absent the procedural guarantees of
Freedman, 493 U.S. at 228.
Id. at 1335.

   Judge Ripple and the two judges joining his
concurrence found that the concerns the Court
voiced in both Lakewood and FW/PBS were not
present in Graff because the ordinance in no way
placed unfettered discretion in the hands of city
officials. They therefore concluded that the
ordinance should be analyzed according to the
time, place, and manner guidelines of Cox, Clark,
and City of Renton v. Playtime Theatres, Inc.,
475 U.S. 41 (1986)./4

   The Supreme Court's recent decision in Hill v.
Colorado, 120 S.Ct. 2480 (2000), has added to the
discussion of the distinction between prior
restraints and time, place and manner
restrictions, but it has not resolved the issue.

See Hill, 120 S.Ct. at 2491 (holding that Colorado statutory provision making it unlawful for any person to knowingly approach within 8 feet of another without that person's consent, to pass out information or engage in oral protest, education, or counseling, was not a prior restraint, but restricts the "place" of such communication). Also adding to the uncertainty is the fact that other circuits which have considered the constitutionality of parade-permit and licensing statutes following FW/PBS have treated such regulations as prior restraints of speech, subject to the procedural safeguards required of prior restraints. MacDonald v. Safir, 206 F.3d 183, 194 (2d Cir. 2000) (New York's parade-permitting ordinance is a prior restraint on speech because one must get a permit from the Commissioner before staging a parade in New York); Nightclubs, Inc. v. City of Paducah, 202 F.3d 884, 889, 891 n.6 (6th Cir. 2000) (city's licensing scheme of adult business is a prior restraint of speech); Baby Tam & Co., Inc. v. City of Las Vegas, 154 F.3d 1097, 1100 (9th Cir. 1998) ("Because [the Las Vegas ordinance] requires all proposed [adult] bookstores to apply for and obtain a license before engaging in business, the City's licensing scheme is properly analyzed as a prior restraint."); American Target Advertising, Inc. v. Giani, 199 F.3d 1241, 1250 (10th Cir. 2000); cf. Boss Capital, Inc. v. City of Casselberry, 187 F.3d 1251, 1255 (11th Cir. 1999) (applying Freedman factors to licensing ordinance, without classifying it as a prior restraint). And some circuits have considered permit and licensing ordinances as both time, place and manner restrictions and as prior restraints, applying both constitutional standards to the challenged ordinance. See, e.g., 11126 Baltimore Blvd., Inc., 58 F.3d at 995-96 (noting that otherwise valid time, place and manner regulation must be analyzed as prior restraint if ordinance requires a license to open adult bookstore); TK's Video, Inc. v. Denton County, Texas, 24 F.3d 705, 707 (5th Cir. 1994); Beal v. Stern, 184 F.3d 117, 123-24 (2d Cir. 1999).

This court recently resolved this uncertainty in Thomas. As noted above, Thomas considered the constitutionality of Chicago's park-permit ordinance. While the plaintiffs in Thomas had argued that the park-permit ordinance constituted an unconstitutional prior restraint, this court rejected a prior restraint formula stating:

We do not find this [prior restraint formula] a helpful formula. The historical referent of "prior restraints" is censorship, see 4 William Blackstone, Commentaries on the Laws of England 151-53 (1769), which the administration of a park

system does not much resemble. The statement in the plaintiffs' brief that "denial of a permit to hold a rally is the ultimate censorship" is hollow rhetoric. It is a censor's business to make a judgment about the propriety of the content or message of the proposed expressive activity. Because he is in the business of suppressing such activity (friends of free speech are not drawn to a career in censorship), the danger of abuse is very great, especially when assessed in light of the dismal history of censorship.

The regulation challenged here does not authorize any judgment about the content of any speeches or other expressive activity--their dangerousness, offensiveness, immorality, and so forth. It is not even clear that the regulation reduces the amount of speech. A park is a limited space, and to allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech. See Cox v. New Hampshire, 312 U.S. 569, 574-76, 85 L. Ed. 1049, 61 S. Ct. 762 (1941); cf. Beal v. Stern, 184 F.3d 117, 128-29 (2d Cir. 1999). Just imagine two rallies held at the same time in the same park area using public-address systems that drowned out each other's speakers. Cf. Ward v. Rock Against Racism, 491 U.S. 781, 105 L.Ed. 2d 661, 109 S. Ct. 2746 (1989). The heterogeneity of the practices that the "prior restraints" formula covers (with the present case compare Freedman v. Maryland, 380 U.S. 51, 13 L. Ed. 2d 649, 85 S. Ct. 734 (1965), involving a movie censorship board) is reason to doubt that it can provide much assistance to judges who have to decide a novel case.

Thomas, 227 F.3d at 923-24. Because the park-permit ordinance at issue in Thomas did not concern itself with the content of the proposed speech, this court treated the ordinance as a time, place and manner licensing system. Id. at 926.

Thomas controls the case at hand, and we accordingly conclude that the appropriate approach is the time, place and manner analysis set forth by the Supreme Court in Cox and Clark. Here, as in Cox, Clark and Thomas, we have a permit scheme which limits the discretion of the government based on content-neutral criteria, and therefore the threat of censorship characteristic of a prior restraint is remote. Moreover, the ordinance at issue here presents an even more compelling case for a time, place and manner analysis than that at issue in Graff because Section 10-8-330 does not, in advance of the planned parade or thereafter, prohibit anyone from marching. Rather, the ordinance requires the

Commissioner to issue an alternative permit whenever he denies the permit application as requested, and the alternative permit must "to the extent practicable authorize an event that will have comparable public visibility and a similar route, location and date to that of the proposed event." Thus, the ordinance does not restrict speech, but regulates the time, place and manner of marches designed to present speech.

However, that does not end the question, because not all time, place and manner restrictions pass constitutional muster. Time, place and manner restrictions "are constitutional, if they: (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication of the information." DiMa Corp. v. Town of Hallie, 185 F.3d 823, 828 (7th Cir. 1999).

In this case, those aspects of Chicago's parade ordinance which MacDonald challenges are justified without reference to the content of the marchers' speech. First, the ordinance requires the Commissioner to determine whether the proposed activity will interfere with traffic. This determination does not depend on the content of the march's speech. Nor does the provision of the ordinance requiring the Commissioner to determine whether the concentration of parade participants will prevent proper fire and police protection consider the content of the speech. These are safety considerations that are neutral by any objective standard.

The final challenged aspect of the ordinance, however, requires a closer examination. Under subsection (h)(2) the Commissioner must determine whether "[t]here are available . . . a sufficient number of peace officers to police and protect lawful participants in the activity and non-participants from traffic related hazards in light of the other demands for police protection at the time of the proposed event or activity." Relying on Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123 (1992), the district court concluded that subsection (h)(2) constitutes a content-based regulation of speech because it believed that the Commissioner would necessarily consider the content of the marchers' message in order to assess policing needs. (He thought sections (1) and (3) covered the safety issues, so section (2) would be more concerned with content.)

The district court's reliance on Forsyth County for this conclusion was misplaced. Unlike this case, Forsyth involved an assessment of fees to

help cover the cost of police protection. There the Supreme Court held that an ordinance which required groups seeking demonstration permits to pay for the estimated costs of police protection for the demonstrators violated the First Amendment because it required the county to first examine the content of the demonstrators' message in order to "estimate the response of others to that content, and to judge the number of police necessary to meet that response." Id. at 134. In contrast, subsection (h)(2) instructs the Commissioner to consider only the availability of police to protect participants from traffic hazards. The content of the marchers' speech lacks any bearing in that assessment. In Forsyth the county had to determine the cost of providing police protection for the demonstrators based on all dangers, but most significantly the potential for a violent response to the speech. The fee provision was "invalid because it unconstitutionally tie[d] the amount of the fee to the content of the speech . . . ." But cost is not the concern here. Moreover, in most situations the Commissioner does not even know the content of the marchers' speech as the permit application does not request such information. Rather, the question in section (2) is the availability of sufficient police resources at a particular time and place to protect marchers from traffic hazards. Thus, the Chicago ordinance is readily distinguishable from the ordinance in Forsyth County, and in contrast to that ordinance lacks any content-based consideration.

The dissent contends that this case is no different than Forsyth County, arguing that the City's assessment of the number of officers needed to protect participants and non-participants from traffic hazards may depend on the purpose (speech content) of the parade. Dissent at 35-36. On the contrary, there are two distinct differences from Forsyth County. First, the plain language of Chicago's ordinance makes clear that the Commissioner should consider only "traffic-related hazards." Second, the Commissioner does not know the content of the speech because the permit application does not ask for any information about the purpose of the parade or the motive of the participants. sec. 10-8-330(e). If the Commissioner or the police impose rules or restrictions beyond those specifically set forth in the ordinance, an as-applied challenge may be in order. But in the facial challenge before this court there is no evidence that content has anything to do with the Commissioner's assessment of the permit application.

The dissent also maintains that Chicago's ordinance is more restrictive than the one in

Forsyth County, because "there is no amount a marcher can pay to be allowed to march if the City decides the burdens are too great." Dissent at 34. However, contrary to the dissent's concern, the Chicago ordinance bars no one from marching; rather, if the City determines that traffic hazards are too great and police protection insufficient for that time and place, then the City must "authorize the conduct of a parade, public assembly or athletic event on a date, at a time, at a location, or over a route different than that named by the applicant. This alternate permit shall to the extent practicable authorize an event that will have comparable public visibility and a similar route, location and date to that of the proposed event." Municipal Code of Chicago, Ill. sec. 10-8-330(l). Because the City must authorize the parade or other event, hecklers cannot veto unpopular speech "by threatening to show up in large numbers and create traffic hazards of their own." Dissent at 36.

Thomas also supports the conclusion that Forsyth County is distinguishable from the case at hand. In Thomas, the plaintiffs had argued that the park-permit ordinance's requirement that applicants obtain $1 million in liability insurance created a heckler's veto prohibited by Forsyth. This court rejected that argument noting that "the amount of insurance required is not based on, or, so far as has been shown, influenced by, the nature of the event, and specifically by whether it involves controversial expressive activity likely to incite violence by onlookers or opponents." Thomas, 227 F.3d at 925. Rather, the cost of the insurance considered factors such as "the size of the event and the nature of the facilities involved in it (a bandstand, stage, tents, and so forth)." Id. Similarly, in this case, to determine whether "a sufficient number of peace officers" are available to protect participants and non-participants "from traffic related hazards" requires only a consideration of the size of the parade and its nature, i.e., its route and time-- it does not inject content into the City's consideration of the permit application./5

A time, place and manner restriction must also be narrowly tailored to serve a significant government interest. Chicago Ordinance 10-8-330 promotes a significant government interest, primarily the safety of citizens, and specifically the organized, effective, and safe flow of traffic, including emergency vehicles. The regulation is also narrowly tailored to promote these interests, first by requiring an individualized assessment of the proposed march vis-a-vis these concerns, and second by requiring

the City to tailor an alternative route which does not interfere with safety, traffic and emergency services. While this second rationale also ensures ample alternative channels of communication, see infra at 24, it assures that the ordinance is narrowly tailored to the City's interests by requiring the next-best route be offered to the applicant. Moreover, absent this ordinance, the City could be in disarray, with marchers interrupting the flow of workers and sightseers, delivery trucks, buses, and emergency vehicles, as well as other marchers deciding to rally at the same place and on the same day. The government's interest in organizing these potential disruptions would "clearly be achieved less effectively absent the regulation." Ward v. Rock Against Racism, 491 U.S. 781, 801-02 (1989). Accordingly, we conclude that Section 10-8-330 satisfies the "narrowly tailored" prong.

Finally, to be constitutional, the time, place and manner restrictions must ensure ample alternative channels of communication in the event that a permit is denied. The ordinance also does this because, as just noted, if the Commissioner denies a permit application, it must "authorize a parade or other public assembly at a time, location and over a route that is to the extent practicable comparable in public visibility and similar in location and date to that requested." Thus, ample alternative channels exist in the event the City denies the proposed parade route.

In sum, because Section 10-8-330 is justified without reference to the content of the regulated speech; is narrowly tailored to serve a significant government interest; and leaves open ample alternative channels for communication of the information, it constitutes a valid time, place and manner regulation of speech.


C.  Procedural Safeguards

MacDonald also argues that Chicago's parade-permit ordinance is unconstitutional because it fails to provide the procedural safeguards set forth in Freedman v. State of Maryland, 380 U.S. 51 (1965). In Freedman, the Supreme Court considered the constitutionality of a Maryland statute that required a motion picture exhibitor to submit films, in advance of their exhibition, to the Maryland State Board of Censors which would approve and license the film if it "was moral and proper" and would refuse a license if the film was "obscene or tended to debase or corrupt morals or incite to crime." Id. at 52 n.2. The Supreme Court struck the law as an unconstitutional prior restraint, and in doing so

set forth three procedural safeguards designed to obviate the dangers of censorship. Specifically, the Freedman Court mandated that: (1) any prior restraint . . . be imposed only for a brief period of time, during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech, and must bear the burden of proof once in court. Id. at 58-59. MacDonald contends that Section 10-8-330 fails to provide safeguards two and three, and that it is therefore an unconstitutional prior restraint.

MacDonald first argues that the ordinance fails to guarantee prompt judicial review. However, contrary to MacDonald's position, the Chicago Ordinance allows for judicial review. Specifically, Section 10-8-330 provides that the Commissioner's decision may be appealed to the mayor and the mayor's decision is then "subject to judicial review in accordance with applicable law." In Illinois, judicial review of a decision to deny a permit application may be had in state court by a writ of common law certiorari. This is not good enough, according to MacDonald: MacDonald argues that the Freedman "prompt judicial review" safeguard requires more than a possibility of judicial review--it requires the guarantee of a prompt decision on the merits.

The circuits are split on this issue. The Fourth, Sixth and Ninth Circuits have held that prompt judicial review requires a prompt decision on the merits. 11126 Baltimore Blvd., 58 F.3d at 1000-01 ("prompt judicial review" requires "prompt judicial determination"); Nightclubs, Inc. v. City of Paducah, 202 F.3d 884, 892 (6th Cir. 2000) ("[T]his Circuit and a number of other circuits have held that a licensing scheme must reasonably ensure a prompt judicial determination, and not mere access to judicial review."); Baby Tam & Co., Inc., 154 F.3d at 1101 ("'prompt judicial review' means the opportunity for a prompt hearing and a prompt decision by a judicial officer"). Conversely, the First, Fifth and Eleventh Circuits have held that for permit and licensing ordinances, prompt judicial review only requires access to prompt judicial review. Jews for Jesus, Inc. v. Massachusetts Bay Transp. Auth., 984 F.2d 1319, 1327 (1st Cir. 1993) ("prompt judicial review" is provided where applicant may appeal license denial in court); TK's Video, Inc., 24 F.3d at 709 (holding that ordinance which gives an unsuccessful license applicant 30 days to appeal to the district court satisfies the "prompt judicial review requirement"); Boss Capital, Inc., 187 F.3d at 1256 (for licensing ordinances, prompt judicial review only means access to prompt judicial

review)./6

While the circuits are split on this issue, this court has recently made clear in Thomas that in this circuit a common law certiorari proceeding "is good enough for a regulation of expressive activity when the regulation is not a form of censorship, that is, does not require or permit the regulatory authority to evaluate the content or message of the activity regulated." Thomas, 227 F.3d at 926 (citing fractured opinion in Graff and "counting noses" to reach this conclusion). Because this case--like Thomas--involves a permit regulation that is not a form of censorship and that does not evaluate the content or the message of the activity, judicial review through Illinois' common law certiorari proceedings satisfies constitutional scrutiny.

MacDonald also argues that the parade-permitting ordinance fails to satisfy the third safeguard established in Freedman, that being that the government bears the burden of going to court if it wants to deny the permit, and once in court, it must bear the burden of proving that the denial is constitutional. However, this third Freedman safeguard was established in a case addressing censorship. Following Freedman, the Supreme Court considered the need for this safeguard in the context of a licensing statute. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990). In FW/PBS, a plurality of the Court concluded that the third safeguard was required only in those situations in which "the censor engaged in direct censorship of particular expressive material." Id. at 229. Because the censoring ordinance in FW/PBS did "not exercise discretion by passing judgment on the content of any protected speech," the Court's plurality concluded that "the First Amendment does not require that the city bear the burden of going to court to effect the denial of a license application or that it bear the burden of proof once in court." Id. at 230.

This court has likewise concluded, based on the rationale of FW/PBS, that a content-neutral licensing or permit statute need not include a provision requiring the government to bear the burden of going to court to deny a permit. Thomas, 227 F.3d at 926-27. See also, Graff, 9 F.3d at 1324 n. 11; id. at 1330 (Flaum, J. concurring) ("Further, after FW/PBS, it seems likely that Freedman's third requirement--that the licensor bear all court-related burdens--does not apply in this case."). Accord, Beal v. Stern, 184 F.3d 117, 128 (2d Cir. 1999) (because park permit ordinance was content-neutral prior restraint, it "need comply with only the first two Freedman factors."). Therefore, based on

FW/PBS, Thomas and Graff, we conclude that Chicago ordinance Section 10-8-330 need not satisfy the third Freedman standard.

Before closing, we note that our conclusion that the third Freedman factor does not apply to Chicago's parade-permit ordinance acknowledges not only the legal distinction between censorship and a content-neutral licensing scheme--it recognizes the practical reality of the situation. The third Freedman factor is completely unworkable in the context of the parade-permit process. Consider the typical scenario in which an applicant requests a specific parade route, date and time. But it is rush hour, or another parade is scheduled, or the day-to-day affairs of the city are too greatly affected to allow the exact time and place of the requested route, so the City seeks to accommodate the speech by proposing an alternative route. However, if the third Freedman factor applies, any time the City failed to accede to the marchers' demands it would be forced to first go to court to prove its case. Even as the City proceeds in court, new permit applications come in, requiring the Commissioner to consider the public safety concerns set forth in the Ordinance. But he can't because his earlier decisions are not yet final--they are tied up in court. And if a court then mandates a certain route or time which the Commissioner had previously denied, that could impact several other decisions (that were not contested) that the Commissioner has made in the meantime about locations and times, police availability, and traffic flow. It is unclear how the Commissioner could possibly function under such a court-imposed structure. But because the Chicago Ordinance is not a device of censorship, the third Freedman factor does not apply, and the City of Chicago will not be required to initiate legal action before denying or altering an application for a parade permit.

III.  Conclusion

Chicago oversees parades and marches throughout the city to ensure not only the safety of people who regularly use these routes but also the safety of participants and parade-goers alike, and to allow for the prompt and efficient flow of traffic and emergency vehicles. This is a content-neutral time, place and manner restriction, justified by its purpose--not its content--and it is narrowly tailored to serve a significant governmental interest, while leaving open ample channels of communication. Section 10-8-330 also does not unconstitutionally vest the Commissioner with unfettered discretion.

Moreover, because Section 10-8-330 is not a form of censorship, but a time, place and manner restriction, Illinois' common law certiorari process is constitutionally adequate. For these reasons, we REVERSE the district court's decision declaring the ordinance an unconstitutional prior restraint.

FOOTNOTES

/1 For simplicity's sake, we will continue to refer to MacDonald and "his" arguments on appeal.

/2 The "Loop" is a portion of the central Chicago business district, which gets its name from the elevated trains that "loop" around it.

/3 A red-lined version of the entire ordinance, showing the current amendments to the earlier version, appears in Appendix A.

/4 In recognition of the continuing discussion and debate in the courts and in the legal community at large, Judge Ripple's concurrence noted that "there is a great need for clarification of standards in this area, and I respectfully suggest that this case is deserving of further review in the Supreme Court of the United States." Id. at 1335. Although the Court did not review Graff, the Court's decisions since then have also not resolved the conflicting analyses.

/5 On appeal, notwithstanding the City's extensive analysis of this issue, MacDonald fails to present a case justifying the district court's view that the ordinance is content-based, stating merely in a footnote that the district court's conclusion was obviously correct.

/6 It is unclear exactly where the Second Circuit stands. Compare Beal v. Stern, 184 F.3d 117, 129 (2d Cir. 1999) ("prompt access to judicial review in state courts would satisfy Freedman") (emphasis added), with MacDonald v. Safir, 206 F.3d 183 (2d Cir. 2000) (noting that Beal held that "prompt access to judicial review in state courts would satisfy Freedman," but concluding that the record was insufficient to determine whether available state court proceedings satisfied that requirement).

Rovner, Circuit Judge, concurring in part, dissenting in part. Our recent opinion in Thomas v. Chicago Park District, 227 F.3d 921 (7th Cir. 2000) answered some but not all of the questions raised in this appeal. That case involved essentially the same parties we have here, the Windy City Hemp Development Board and a sub-unit

of the City of Chicago, namely, the Chicago Park District. In that case, Windy City Hemp challenged a Park District regulation that restricted the use of the City's parks for gatherings, including political rallies. The Park District regulation required that a permit be obtained for any assembly in a park by a group of 50 or more persons. The regulation spelled out the criteria for the grant of a permit, the procedures for obtaining it, and the process for challenging the denial of a permit. We found that the Park District regulation did not vest unfettered discretion in the government official charged with issuing permits, and that the regulation was not impermissibly vague. We also held that requiring applicants to obtain liability insurance did not amount to a heckler's veto because the amount of insurance required was based not on the content of the speech but rather on the size of the event and the nature of the facilities involved. We further found that the regulation's requirement for a 30- to 60-day lead time for permit processing was reasonable in light of the attendant administrative burden and was not harmful to speech in light of exceptions the City allowed for spontaneous rallies in reaction to current events. Finally, we rejected Windy City Hemp's main objection, that the regulation failed to adequately provide for judicial review of permit denials. We found that Illinois' procedure for common law certiorari was an adequate means of review, and that alternate channels of review were available in federal court. We therefore concluded that the Park District regulation did not unconstitutionally impinge on Windy City Hemp's First Amendment rights.

MacDonald now challenges the City's requirement that he obtain a permit in order to hold a parade on the City's streets. I agree with the majority that the amended version of the ordinance is the only one before us on review. The amended parade ordinance is considerably more vague than the Park District regulation. Rather than objective criteria regarding the number of participants and the nature of the facilities, the ordinance sets forth a number of subjective factors that the City may use to deny a permit to march on city streets. The City may deny a permit if the proposed activity will "substantially and unnecessarily" interfere with traffic, if there are insufficient numbers of police officers available to protect participants and non-participants from traffic-related hazards, and if the concentration of persons or things on the route will prevent proper fire and police protection or ambulance service. Under this scheme, it is not difficult to see how the City might decide that a parade honoring the Chicago

Bulls that snarls traffic for miles does not "substantially or unnecessarily" interfere with traffic, but that MacDonald's small band of marijuana protesters will overwhelm City resources and interfere with traffic to an unacceptable level./1 Nonetheless, the ordinance is not so subjective on its face that it allows an exercise of "unfettered discretion," especially in light of the fact that judicial review is readily available. I therefore concur with the majority's conclusion on that issue.

I part company with the majority, however, on the issue of whether the ordinance impermissibly allows a heckler's veto. See Forsyth County, Georgia v. Nationalist Movement, 505 U.S. 123 (1992). The ordinance challenged in Forsyth County provided that every parade permit applicant "shall pay in advance for such permit, for the use of the County, a sum not more than $1,000.00 for each day such parade, procession, or open air public meeting shall take place." 505 U.S. at 126. Moreover, the county administrator was empowered to "adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." 505 U.S. at 127. A group of white supremacists sought to march in opposition to the federal holiday celebrating the birth of Martin Luther King. The county set a fee of $100 for the permit. Rather than pay the fee, the would-be marchers sued the county. The Supreme Court noted that sometimes the county included all of the administrative and police expenses in the fee, and sometimes included only a portion of those costs in the fee. As construed by the county, the Court noted, the ordinance often required that the fee be based on the content of the speech. 505 U.S. at 133-34. The ordinance did not explicitly state that fees were based on content, of course. Rather, the ordinance allowed the county administrator to assess a fee to cover the cost of protecting persons participating in or observing the parade. In order to assess accurately the cost of security for parade participants, the administrator necessarily "examine[d] the content of the message that is conveyed." 505 U.S. at 134 (quoting Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 230 (1987)). The administrator would also have to estimate the response of others to the content and judge the number of police necessary to meet that response. Thus, the "fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content." Forsyth County, 505 U.S. at 134.

The County argued that, although the cost of

policing relates to content, the ordinance itself was content neutral because it was aimed at a secondary effect, the cost of maintaining public order. The Forsyth Court noted that, nevertheless, "it cannot be said that the fee's justification 'ha[s] nothing to do with content.'" 505 U.S. at 134 (citing Ward v. Rock Against Racism, 491 U.S. 781, 792 (1989). The Court explained,

The costs to which petitioner refers are those associated with the public's reaction to the speech. Listeners' reaction to speech is not a content-neutral basis for regulation. . . . Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob.

Forsyth County, 505 U.S. at 134-35 (citations omitted). The Court concluded that regulations which permit the government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment. The Court also held that although raising revenue for police services was undoubtedly an important government goal, it did not justify a content-based permit fee.

Acknowledging that Forsyth County is good law, the majority seeks to distinguish it. Supra at 20-23. The majority notes that, unlike the Chicago parade ordinance, the Forsyth County ordinance involved an assessment of fees to help cover the cost of police protection. The Chicago ordinance directs the Commissioner to consider the availability of police to protect participants from traffic hazards only, and according to the majority, the words "traffic hazards" are determinative here--because the Commissioner assesses the need for officers only in terms of traffic hazards, the content of the marchers' speech purportedly is not implicated. Supra at 21. In Forsyth County, by contrast, the county commissioner calculated the cost of providing police protection for demonstrators based on all dangers but most significantly considered the potential for violent response to the speech. The fee was thus tied to the content of the speech. The majority sees the Chicago ordinance as different in three respects. First, the Chicago ordinance does not involve fees at all. Second, the only hazard the City must consider in denying or granting a permit is whether there are sufficient police officers available to protect participants (and non-participants) from traffic perils. Third, because the Commissioner does not necessarily even know the content of the speech when making that determination, the ordinance lacks content-based discrimination, according to the majority.

That Forsyth County involved a fee-based permit is certainly not determinative. In fact, the Chicago ordinance is more restrictive than Forsyth County's law in the sense that the ban on speech is outright; there is no amount a marcher can pay to be allowed to march if the City decides the burdens are too great. Forsyth County itself acknowledged that "[s]peech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." 505 U.S. at 134-35. Thus, a fee is no different from a ban, and in fact might be less intrusive; but under Forsyth County both a fee and a ban based on content cannot stand.

I believe it is disingenuous for the City to claim it does not know the content of the speech before a particular event, and therefore does not consider the content in determining whether the permit shall issue, or in determining whether the crowd size (including hecklers) will be prohibitive. First, the permit application requires the name of both the person signing the application, and the name of the "authorized and responsible leaders of the organization conducting the parade." Chicago Ordinance sec. 10-8-330(e)(1)-(2). More often than not, the name of the organization alone will tip the City off to the content of the proposed speech, as was certainly true in this case. The City could not seriously contend that it did not know what message would be conveyed by the Windy City Hemp Development Board. Indeed, most of the organizations whose speech is controversial and who are most at risk for censorship are readily recognizable from their names. See Collin v. Smith, 578 F.2d 1197 (7th Cir. 1978), cert. denied, 439 U.S. 916 (1978) (suit allowing the National Socialist Party of America, a Nazi organization, to march through Skokie, Illinois); Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557 (1995) (suit prohibiting gay and lesbian organization from participating in Boston's St. Patrick's Day parade).

Second, the City requires the applicant to estimate the approximate number of persons to participate in the parade, and to inform the City of the basis on which this estimate is made. Chicago Ordinance sec. 10-8-330(e)(5). If the Commissioner denies a permit for failure to provide sufficient information about the crowd estimate, the Commissioner will inform the applicant of what additional information must be provided in a new or amended application. Chicago Ordinance sec. 10-8-330(l). These last two factors combine to require the applicant to

provide the City with the information necessary for the City to estimate the response (including the hostile response) to the parade. Because the applicant is required to provide the basis for the crowd estimate, the content of the speech and its potentially controversial nature are necessarily implicated. In effect, the applicant is required to inform the City of the content of the speech if the content (and the controversial nature) of the speech affects the crowd estimate. Having required the applicant to provide this information, the City may not then deny that it is using that information in deciding whether to issue a permit.

Nor do I see how the words "traffic hazards" save the ordinance from the dictates of Forsyth County. Counter-protestors are just as likely to threaten to spill out into the streets as they are to assault marchers. When the City is assessing whether it has adequate numbers of peace officers to protect both participants and non-participants from traffic hazards, it is necessarily considering both the number of counter-demonstrators and the possibility of unruliness and violence. The Supreme Court rejected Forsyth County's characterization of its ordinance as content-neutral on the grounds that it was aimed at a secondary effect--the cost of maintaining public order. 505 U.S at 134. In the Court's view, because the secondary effect with which the County purported to be concerned was entwined with the message that the permit-seekers sought to convey, "it cannot be said that the fee's justification 'ha[s] nothing to do with content.'" 505 U.S at 134 (quoting Ward, 491 U.S. at 792). Likewise, in Chicago, it cannot be said that assessing the number of officers needed to protect participants and non-participants from traffic hazards has nothing to do with content of the proposed parade. In some part, that assessment will be based on the size of any counter-demonstration that might ensue, on the level of hostility that the parade might generate. Traffic is difficult in a city like Chicago on the best of days, and it can be disrupted by even minor mishaps. It is therefore easy to imagine that the City might deem even a small parade too great a threat to the orderly flow of traffic if the content of the parade strikes the City regulators as controversial. In effect. under the Chicago ordinance, counter-protestors can apply their heckler's veto by threatening to show up in large numbers and create traffic hazards of their own.

Although the ordinance provides that the City must issue "to the extent practicable" a permit to hold the parade on an alternate date or on an alternate route with comparable visibility, in

the very least hecklers are given the power to delay or move the event. Timing and location can be integral to the message, and I believe Forsyth County does not allow the City to convey this power to hecklers. Chicago is a city of neighborhoods, each with its own distinct character. A march through the Back of the Yards neighborhood would be no substitute for a march through nearby Bridgeport when the purpose of the march is to protest a racially motivated attack on an African-American youth who happened into the mostly white neighborhood. See Cindy Schreuder & Heather Lalley, Hopes Rise for Teen a Week After Beating Victim Stirs from His Coma as 150 March in Bridgeport, Chi. Trib., March 29, 1997, at 1. A directive to provide "comparable public visibility" on a "similar route" can strip the message of most of its meaning.

Moreover, I do not believe that the Park District case supports the majority's contention that the Chicago parade ordinance does not offend Forsyth County. It is true that the cost of the liability insurance in Thomas was related to the size of the event and the nature of the facilities utilized, and not to the content of the speech or the potential for violent response to the speech. The majority contends that determining whether there are sufficient peace officers to handle traffic-related hazards similarly requires only a consideration of the size of the parade, its route and time. Those considerations may certainly come into play, but the ordinance does not limit the City to such objective factors. It allows the City to subjectively determine whether the burden on municipal resources is too great to allow the parade to go forward, without reference to any standards. Under Forsyth County, any law requiring a license before protected speech may take place must contain narrow, objective, and definite standards to guide the licensing authority. 505 U.S. at 131 (citing Shuttlesworth v. Birmingham, 394 U.S. 147, 150-51 (1969)). The reason for this, according to the Supreme Court, is that when a permit scheme allows the appraisal of facts, the exercise of judgment and the formation of an opinion by an uncabined licensing authority, the danger of censorship is too great. See Forsyth County, 505 U.S. at 131 (citing Cantwell v. State of Connecticut, 310 U.S. 296, 303 (1940) and Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)). The Chicago parade ordinance allows not only the appraisal of facts and exercise of judgment warned against in Forsyth County and other cases, but also grants City officials free reign to consider the effect of counter-demonstrations on its ability to protect against traffic hazards. Therefore, unlike the park ordinance, the parade ordinance

allows the City to deny permits based on a heckler's veto. The Supreme Court has not repudiated Forsyth County and I do not believe this Court should do so on its own. Therefore, I respectfully dissent.

FOOTNOTE

/1 Lest we think this discussion is purely academic, Mayor Rudolph Giuliani of New York recently reminded us that cities do attempt to censor controversial messages. See Giuliani Forms 'Decency' Panel to Review Public Art, L.A. Times, Feb. 17, 2001, at A24. Offended by a photograph displayed at the Brooklyn Museum of Art, the Mayor announced that he was forming a task force to monitor decency in tax-sponsored art exhibits. The photograph depicted a nude African-American woman as a Christ-like figure at the Last Supper. Giuliani had previously cut off funds from that same museum when he was offended by an earlier display. A federal court declared the funding freeze unconstitutional, and the City restored the funds. Similarly, Chicago is not immune to the phenomenon of government censorship. See Alf Siewers & Ray Hanania, Controversial Painting Leads to Brush with Law, Chi. Sun-Times, May 12, 1988, at 1. Three City alderman removed a controversial painting from the wall of a museum associated with the School of the Art Institute, and the police then impounded the painting. The painting depicted the late Mayor Harold Washington in a manner that many found offensive.

APPENDIX