In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-4153 & 99-4226

MARTIN DEBOER, SOO AI KUDO,
DAVID MARTIN, et al.,

Plaintiffs-Appellants, Cross-Appellees,

v.

VILLAGE OF OAK PARK, an Illinois municipal
corporation, BARBARA FURLONG, in her
official capacity as President of the
Village of Oak Park, SANDRA SOKOL, in her official
capacity as Village Clerk of the Village
of Oak Park, et al.,

Defendants-Appellees, Cross-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 2437--Marvin E. Aspen, Chief Judge.

ARGUED SEPTEMBER 26, 2000--DECIDED September 20, 2001

  Before COFFEY, RIPPLE and ROVNER, Circuit
Judges.

  RIPPLE, Circuit Judge.  The plaintiffs,
organizers of National Day of Prayer
activities in the Village of Oak Park,
Illinois, brought this action against the
Village and a number of its officials
(collectively "the Village"). The
plaintiffs claimed that certain aspects
of the Village's policy governing the use
of its Village Hall ("the Use Policy")
violated the Free Speech Clause of the
First Amendment. The district court
initially concluded that the Village had
committed unconstitutional viewpoint
discrimination by denying the plaintiffs
access to the Village Hall. The court
also concluded that two additional
aspects of the Use Policy were facially
invalid. Later, after the Village filed a
motion for reconsideration, the court
vacated the part of its opinion that
concluded that the Village had engaged in
viewpoint discrimination, but upheld its
ruling regarding the facial invalidity of
the other challenged aspects of the Use
Policy. For the reasons set forth in the
following opinion, we reverse the
district court's decision that the

Village did not engage in viewpoint discrimination by denying the plaintiffs the use of facilities in the Village Hall. However, we affirm the court's decision regarding the constitutional infirmity of two other aspects of the Use Policy.

I

BACKGROUND

A.  Facts

1.

The Village has a municipal complex that consists of three floors; the ground floor and second floor are commonly referred to as the Village Hall. The Village Hall contains a number of work areas, offices and conference rooms. Prior to 1995, the Village permitted local groups to use the Village Hall facilities on a first-come, first-served basis as long as a majority of persons in attendance were residents of Oak Park.

By mid-1995, use of Village Hall facilities had increased to the point that it began to interfere with the day-to-day operation of village government and significantly increased the Village's expenses for custodial service and maintenance on the facilities. Consequently, the Village adopted the Use Policy, which includes a section governing the use of the Village Hall by members of the public. This section sets forth six requirements that all "public forums, events or activities" must meet in order to be considered for use of the Village Hall:

The forum, event or activity must: (1) be open to all citizens of the Village; (2) have as its primary purpose providing a civic program or activity which benefits the public as a whole; (3) not be based on or must not promote or espouse the philosophy, ideas or beliefs of any particular group, entity or organization[;] (4) be sponsored or put on by a local not-for-profit group or organization based within the Village; (5) not be sponsored or put on by a group or organization that has sponsored or put on a forum, event or activity in the Village Hall during the preceding twelve months, unless exceptional circumstances

are involved; and (6) not be a fundraising event.

R.1, Ex.A at 2. Two rooms were made available for public use under this section of the Use Policy./1

2.

In 1952, Congress declared an annual National Day of Prayer ("NDP") in a joint resolution signed by President Truman. In order to fix permanently the NDP as the first Thursday in May, the law was amended and signed by President Reagan in 1988. Each year, the President issues a proclamation encouraging citizens to pray on that day. According to the plaintiffs, the NDP's purpose is to provide an occasion for Americans to gather together in order to pray for the United States, individual states and communities and officials at all levels of government. In 1993, 1994 and 1995, the plaintiffs were permitted to use the Village Hall to conduct a prayer service in conjunction with the NDP./2 These NDP assemblies were open to all, regardless of religious denomination or belief.

In February 1996, plaintiff Martin DeBoer submitted a "Public Notice of Meeting and Conference Room Sign-up Form" to the Village, seeking to again use the Village Hall for an NDP assembly on May 2, 1996. R.35, Ex.1, Ex.B. In the part of the form labeled "Agenda Items," Mr. DeBoer wrote "Prayer for our community, and our local, state, and national government leaders." Id. Two months later, Village President Lawrence Christmas denied the request by letter on the ground that it violated provisions of the Use Policy. In 1997 and 1998, Mr. DeBoer submitted similar applications, and in both years the Village again denied the request in a letter nearly identical to that issued in 1996./3 From 1996 through 1998, the plaintiffs held the NDP assembly at the Oak Park Library, located a few blocks from the Village Hall.

B. District Court Proceedings and Related Events

1.

After the Village denied Mr. DeBoer's application for the 1998 NDP assembly,

the plaintiffs filed a complaint in the district court on April 20, 1998. This complaint alleged that the Use Policy was unconstitutional on its face because a number of its requirements conferred unbridled discretion on the defendants to determine who could use Village Hall facilities, particularly the requirements that (1) the event provide a civic program or activity that "benefits the public as a whole" and (2) that an event "not be based on or must not promote or espouse the philosophy, ideas or beliefs of any particular group, entity or organization" (the "promote or espouse" requirement). The complaint also alleged that the Village Hall was a "designated public forum" and that, in applying the Use Policy to the NDP assembly, the Village engaged in impermissible content-based discrimination.

During discovery, Village Attorney Raymond Heise explained the particular ways in which the Village believed the NDP assembly to violate the Use Policy. First, he stated that the proposed event was not a "civic program or activity," which the Village defined as one concerning a citizen's relationship to government, but instead was a religious activity because it involved the use of prayer. Second, the event did not "benefit the public as a whole" because it was not civic in nature and would appeal only to a segment of the Village's population. Third, the event violated the "promote or espouse" requirement because the event was based on a particular viewpoint, one that advocated the value of prayer in addressing governmental issues.

Both parties then filed motions for summary judgment. In their summary judgment motion, the plaintiffs argued that the NDP assembly was a "civic program or activity" and that the Village's position that the use of prayer rendered such an activity non-civic constituted impermissible viewpoint discrimination.

On February 18, 1999, the district court ruled on the parties' summary judgment motions. First, the court held that the Village Hall was a nonpublic forum because access to it was granted only to select groups that met the Use Policy's requirements; therefore, access

restrictions to the Village Hall needed only to be reasonable in light of the purposes served by the forum and viewpoint-neutral. The court then held that the Village engaged in viewpoint discrimination by denying the plaintiffs' access request due to a belief that the NDP assembly was not "civic." The court disagreed with the Village's argument that the use of prayer transformed the NDP assemblies into religious, not civic, expression, properly excludable under the Use Policy. Instead, the court found that the event's use of prayer to convey its message was indistinguishable from a discussion about civic leaders from a religious viewpoint, noting that the "only difference is the packaging." R.66 at 8. The court also noted, however, that the record was unclear as to the actual nature of an NDP assembly; it explained that if the "NDP agenda [was] more expansive" than engaging in prayer only for community and government leaders, it would be constitutional for the Village to deny access to the plaintiffs, because the event "could no longer pass as 'civic.'" Id. n.2.

Next, the court found that the Use Policy's "promote or espouse" requirement was unconstitutionally viewpoint-discriminatory on its face. The court disagreed with the defendants' argument that this prong actually promoted viewpoint neutrality because it mandated that "no viewpoint or all viewpoints be expressed." Id. at 10. Rather, it held that viewpoint neutrality requires that government be indifferent to the viewpoints of speakers in its forums and that, by contrast, this prong of the Use Policy "smacks of government management of speech." Id.

Lastly, the court found that the requirement that an event have as its primary purpose the promotion of a "civic program or activity which benefits the public as a whole" granted Village officials unbridled discretion in violation of the Free Speech Clause. The court first explained that the "civic program or activity" portion of the requirement was not constitutionally problematic because the Village had employed a consistent definition of the term "civic" (one involving the relationship between citizens and government) and because its previous decisions

regarding access (prior to this case) had correlated with that definition. However, the court held that the "benefits the public as a whole" requirement could not survive constitutional scrutiny because it did not provide narrow and definite standards through which it could be applied evenhandedly. The court was unclear as to what types of activities actually met such a standard and noted that Village officials also had expressed uncertainty on that point.

2.

As a consequence of the court's decision, the plaintiffs were granted authorization to hold an NDP assembly at the Village Hall on May 6, 1999. Unbeknownst to the plaintiffs, Simone Boutet, an attorney for the Village, attended the event and surreptitiously taped the proceedings.

After the assembly, the defendants filed a motion for reconsideration in the district court, to which they attached a transcript of the proceedings of the 1999 NDP event. On November 10, 1999, the court ruled on the motion and determined that the transcript met the requirements for consideration as newly discovered evidence under Federal Rule of Civil Procedure 60(b).

Turning to the merits of the motion, the court ruled that the transcript demonstrated that the content of the NDP prayer service was primarily religious, not civic. To support its conclusion, the court cited the following aspects of the event: (1) the theme of the service was "Light the Nation with Prayer," and event leaders read and preached about passages from the New Testament and the teachings of Jesus Christ; (2) the audience was lead in a hymn entitled "Heal Our Land," the verses of which contained various quotations from Jesus Christ; (3) lengthy segments of the service were "about the church itself," in which a pastor lead groups in prayers for "the Church," which was defined as "the Body of Christ"; and (4) the group sang a song entitled "Shine, Jesus, Shine" and recited a closing prayer for the church and for government that praised Jesus Christ and asked for his help to "build back a great nation." R.103 at 7-8 (internal quotation marks omitted). The assembly also

included prayer for the local community, the nation and various government leaders (many by name), reflections on the role that prayer has played in the founding of American government and preaching that touched on a number of contemporary political and governmental issues. However, the district court found that these latter elements were not the primary focus of the assembly and that they did not transform it into a civic event. As a result, the court found that the Village constitutionally could exclude the event from the Village Hall.

The court also went further, concluding that, because "the line between civic and non-civic prayer is too fine to be drawn by the law," no form of prayer could be considered civic in content. Id. at 8. The court explained that, regarding prayer, "the content and the manner of expression are so closely intertwined" that "the form of the expression seems to transform even otherwise secular topics into religious subject matter." Id. at 10. The court also explained that forcing the Village to scrutinize proposed prayer services for their civic content would likely lead to an excessive entanglement with religion in violation of the Establishment Clause.

However, the court declined to vacate the portion of its earlier judgment regarding the unconstitutionality of the "promote or espouse" requirement and the "benefits the public as a whole" requirement. It found that, although the plaintiffs properly could be barred from the Village Hall because their event was non-civic, they nevertheless had standing to mount a facial challenge to both of those provisions.

II

DISCUSSION

A.  Introduction

1.

The plaintiffs now appeal the district court's decision that the NDP assembly was not a "civic" event and that the Village's refusal to grant them access to the Village Hall did not amount to viewpoint-based discrimination. The court originally granted summary judgment to

the plaintiffs on this issue, but, after granting the motion for reconsideration, it vacated that portion of its earlier opinion. The Village cross-appeals the district court's decision to grant summary judgment to the plaintiffs by holding that the "promote or espouse" requirement and the "benefits the public as a whole" requirement were unconstitutional.

We review a district court's grant of summary judgment de novo, construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party. See Clay v. Holy Cross Hosp., 253 F.3d 1000, 1005 (7th Cir. 2001). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)./4

2.

The extent to which government can control access to its property depends upon the nature of the property at issue. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800 (1985). Consequently, the Supreme Court has adopted a "forum analysis" to determine the extent to which government may regulate the use of that property. Id. The Court has traditionally identified three types of forums: the traditional public forum, the designated public forum and the nonpublic forum. See Ark. Educ. Tele. Comm'n v. Forbes, 523 U.S. 666, 677 (1998) ("AETC"); Cornelius, 473 U.S. at 802.

A traditional public forum, such as a street or a park, is property that "'by long tradition or by government fiat'. . . has been 'devoted to assembly and debate.'" AETC, 523 U.S. at 677 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)). A designated public forum, in contrast, is a forum created by the government, not through inaction or by permitting limited discourse, "'but only by intentionally opening a nontraditional public forum for public discourse.'" AETC, 523 U.S. at 677 (quoting Cornelius, 473 U.S. at 802).

"'[T]he Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum.'" Id. (quoting Cornelius, 473 U.S. at 802). In both a traditional and a designated public forum, reasonable time, place and manner regulations are permissible, but any content-based prohibition is permissible only if it is necessary to serve a compelling state interest and is drawn narrowly to achieve that interest. See Cornelius, 473 U.S. at 800; Perry, 460 U.S. at 46. Other government properties have been described as nonpublic forums; the government may restrict access to such forums so long as "'the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" AETC, 523 U.S. at 678 (quoting Cornelius, 473 U.S. at 800).

In distinguishing between designated and nonpublic forums, the case law has noted that the more selective the government is in restricting access to its property, the more likely that property will be considered a nonpublic forum./5 The district court undertook this type of forum analysis and found that the Village Hall was a nonpublic forum. It noted that, in implementing a Use Policy with six enumerated requirements that must be met before access can be granted, the Village provided only "selective access" to the Village Hall that was not "indiscriminate" enough to convert the property into a designated public forum. R.66 at 5 (quotation marks omitted).

In considering the forum status of the Village Hall, we note that, in recent cases, the Supreme Court has employed the term "limited public forum" to refer to a forum that the state has reserved "for certain groups or for the discussion of certain topics"; the Court has stated that, in such forums, any restriction must be viewpoint-neutral and reasonable in light of the purpose served by the forum. Good News Club v. Milford Cent. Sch., 121 S. Ct. 2093, 2100 (2001) (quotation marks and citations omitted) (considering school facilities open for a wide, but not unlimited, range of expressive activity a "limited public forum" based on parties' agreement);

Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995) (describing activities fund open to various student groups as a "limited" forum). As several circuits have noted, the use of this terminology in this context has introduced some analytical ambiguity because the Court previously had employed the term "limited public forum" as a subcategory of the designated public forum, subject to the strict scrutiny governing restrictions to designated public forums. See Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330, 345-46 & n.10, n.11 (5th Cir. 2001) (per curiam); Summum v. Callaghan, 130 F.3d 906, 914-16 (10th Cir. 1997). We need not attempt to reconcile this confusion over the proper forum terminology here. Even assuming arguendo that the district court correctly identified the Village Hall as a type of forum subject to something less than the strict scrutiny review given to access restrictions in designated public forums, the Village still could not deny access in a manner that discriminated against a speaker based on his viewpoint. As our analysis will indicate, we believe that the Village violated this principle of viewpoint neutrality in denying access to the plaintiffs, discrimination that is impermissible regardless of forum status.

B.  The NDP Assembly as a "Civic Program or Activity"

The Village determined that the NDP assembly did not have as its primary purpose providing a "civic program or activity." A number of Village officials defined the term "civic program or activity" in a similar manner, declaring that it referred to an event focused on citizens and their relationship with government or the manner in which they are governed./6 The district court held that this definition was sufficiently clear that the Village could apply the "civic program or activity" requirement in a viewpoint-neutral manner, and the parties do not dispute this proposition on appeal./7

However, the Village has construed the term "civic program or activity" to exclude categorically any event that involves religious prayer and worship. The Village believes that, even if the stated purpose and actual focus of an event relates to citizens and their

government, that event is transformed into a "religious activity," not a civic one, if it involves prayer and worship activities. The district court ultimately agreed with the Village's position, holding that "religious prayer services are inherently non-civic in content" and that the use of prayer transforms even otherwise secular topics into religious subject matter. R.103 at 10./8

As we have noted, the Village's exclusion of the NDP assembly from the Village Hall must at least be reasonable in light of the purpose served by the forum and viewpoint-neutral./9 With respect to viewpoint neutrality, the government may exclude a speaker

[i]f he wishes to address a topic not encompassed within the purpose of a forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, [but government] violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

Cornelius, 473 U.S. at 806 (internal citations omitted); see also Rosenberger, 515 U.S. at 829-30.

In light of this standard, we must respectfully disagree with the district court's determination. We believe that the NDP assembly is a "civic program or activity," as the Village has defined the term, and that the Village's denial of the plaintiffs' application to use the Village Hall constitutes viewpoint discrimination. In adopting the philosophical and theological position that prayer, the singing of hymns and the use of Bible commentary can never be "civic," the Village has discriminated against the speech of those of its citizens who utilize these forms of expression to convey their point of view on matters relating to government.

The Supreme Court's recent decision in Good News Club v. Milford Central School, 121 S. Ct. 2093 (2001), which was rendered after the district court's ruling in this case, strongly supports our holding. In Good News, a New York school enacted a community use policy opening its building for, among other things, "instruction in any branch of

education, learning or the arts" and "social, civic and recreational meetings and entertainment events, and other uses pertaining to the welfare of the community." Good News, 121 S. Ct. at 2098 (internal quotation marks and citations omitted). A local Good News Club, a private Christian organization for children ages six to twelve, sought to hold the Club's weekly meetings in the school's cafeteria. See id. These meetings used the recitation of Bible verses, biblical stories and songs that included references to Jesus Christ to discuss issues such as moral and character development. See id.; Good News Club v. Milford Cent. Sch., 202 F.3d 502, 504-06 (2d Cir. 2000) ("Good News I"). Leaders also encouraged children to accept Jesus Christ as their savior and made use of prayers to convey their message at various times. See Good News, 121 S. Ct. at 2098; Good News I, 202 F.3d at 504-06. The school denied the Club's request on the grounds that these meetings were the equivalent of religious worship and instruction and that they violated a part of the use policy that forbade use for religious purposes. See Good News, 121 S. Ct. at 2098. A divided panel of the United States Court of Appeals for the Second Circuit ultimately agreed, finding that the subject matter of the Club's activities was "'quintessentially religious,'" fell "'outside the bounds of pure moral and character development'" and therefore equaled constitutional subject discrimination, not unconstitutional viewpoint discrimination. Id. at 2099 (quoting Good News I, 202 F.3d at 510-11) (internal quotation marks omitted).

  The Supreme Court reversed that decision. Noting that the school interpreted its policy to include discussion of moral and character development, and that the Club's meetings did address such topics, the Court found that the school engaged in impermissible viewpoint discrimination by excluding the Club on the ground that its activities were religious in nature. See id. at 2101. The Court compared the case with that of Lamb's Chapel v. Central Moriches Union Free School District, 508 U.S. 384 (1993), in which the Court had found that a school district engaged in viewpoint discrimination when it excluded a church from presenting films teaching family values (a subject otherwise permissible

in the forum) from a Christian perspective. See id. The Supreme Court then explained that "[t]he only apparent difference between the activity of Lamb's Chapel and [that] of the Good News Club is that the Club chooses to teach moral lessons from a Christian perspective through live storytelling and prayer" rather than through films, a distinction the Court found "inconsequential." Id./10 The Court rejected the idea that "any time religious instruction and prayer are used to discuss" an otherwise includible subject, that discussion is "not a 'pure' discussion of those issues," from a religious viewpoint. Id. at 2102.

As did the school in Good News, here the Village attempts to distinguish between the discussion of permissible subject matter (here, civic issues) from a religious perspective and the use of prayer and religious instruction or worship to discuss or convey a message regarding such subject matter. As the Supreme Court has noted, this is a distinction without a real substantive difference. See id. at 2101; Widmar v. Vincent, 454 U.S. 263, 268 n.6 (1981) (noting that a distinction between religious speech and religious worship lacks "intelligible content"). A prayer service regarding civic issues is certainly distinct from other types of discussion about civic matters informed by a religious perspective. However, that difference in form and tone does not alter the reality that worship and prayer directed toward the betterment of government and the enlightenment of civic leaders are methods of expressing a religious viewpoint about civic subject matter. By restricting the plaintiffs from using the means of expression that best reflects their views on how to address civic problems or best provides the reasons (albeit grounded in Christianity and the Bible) as to why they believe their viewpoint to be persuasive, the Village is requiring a "sterility of speech" from the plaintiffs that it does not demand of other groups with regard to this requirement. Good News, 121 S. Ct. at 2109 (Scalia, J., concurring).

The notion that religious prayer and worship is not properly viewed as a method of discussing civic subject matter

is belied by our nation's long tradition of using those forms of expression to inform governmental action. From George Washington's invocation of prayer in his first inaugural address, see Lee v. Weisman, 505 U.S. 577, 633 (1992) (Scalia, J., dissenting) (quoting Inaugural Addresses of the Presidents of the United States, S. Doc. 101-10, p. 2 (1989)), to the chaplains' prayers that have opened each congressional session since the first Congress, see Marsh v. Chambers, 463 U.S. 783, 787-88 (1983), to the use of the invocation "'God save the United States and this Honorable Court'" that has opened Supreme Court sessions since the days of Chief Justice Marshall, Lee, 505 U.S. at 635 (Scalia, J., dissenting) (quoting 1 C. Warren, The Supreme Court in United States History 469 (1922)), to the opening of Cabinet meetings with a prayer, see N.Y. Times, Aug. 5, 2001, at 1 (National Edition), prayers and the invocation of divine guidance have been accepted as part of American political discourse throughout the history of this Republic.

The civic nature of the NDP assembly as part of that well-established practice is particularly evident. The event was a part of a national observance designed to afford citizens who believe that prayer is an important component of civic obligation the opportunity to discharge that obligation by praying together for the welfare of their country. Indeed, it is a day designated for this purpose by Congress, see 36 U.S.C. sec. 119, and recognized each year by the President in a proclamation. In his application for the 1999 NDP event, Mr. DeBoer listed the purpose of the assembly to be "Prayer for community, state and national leaders," R.80, Ex.A, and the transcript of the event demonstrates that its intent was to pray for and discuss civic concerns-- those matters relating to the citizenry and their government.

Indeed, were the Village to enforce a Use Policy that required it to distinguish between speech from a religious viewpoint and religious prayer, instruction or worship, a review of such distinctions, the Supreme Court has indi cated, ultimately would be beyond a court's competence to administer. See Widmar, 454 U.S. at 269-70 n.6; Fowler v. Rhode Island, 345 U.S. 67, 70 (1953).

Such scrutiny inevitably would entangle the Village with religion to an impermissible degree. See Widmar, 454 U.S. at 269-70 n.6 (noting that such inquiries ultimately would require the state "to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith"); see also Good News, 121 S. Ct. at 2111 (Scalia, J., concurring); Rosenberger, 515 U.S. at 844-45; Bd. of Educ. of Westside Cmty. Schs. v. Mergens, 496 U.S. 226, 248, 253 (1990). Indeed, the Village's attempt to parse the 1999 NDP assembly into such categories on a line-by-line basis demonstrates the futility and the intrusiveness of such an approach. Such monitoring would be "far more inconsistent with the Establishment Clause's dictates" than would the Village's provision of the Village Hall on a religion-blind basis, so long as an activity otherwise met its "civic program or activity" requirement. Rosenberger, 515 U.S. at 845./11

Religious expression holds a place at the core of the type of speech that the First Amendment was designed to protect. See Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995). Indeed, the Supreme Court's

precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression. Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince.

Id. (internal citations omitted) (emphasis in original). In barring the plaintiffs from access to the Village Hall, the Village discriminated against the plaintiffs based on their religious viewpoint, a violation of the First Amendment's mandates.

C. The Other Challenged Requirements of the Use Policy

1. The "Promote or Espouse" Requirement

The district court also determined that

the Use Policy's requirement that a proposed event "not be based on or . . . promote or espouse the philosophy, ideas or beliefs of any particular group, entity, or organization" was unconstitutionally viewpoint-discriminatory on its face. The Village has interpreted this phrase to require that "a qualifying civic program must accommodate various viewpoints on the civic topic," Appellees/Cross-Appellants' Br. at 46; therefore, a group may not use the Village Hall to discuss a "civic" topic unless it allows all points of view to be expressed, even those antithetical to its position on that topic. The Village determined that the NDP assembly violated this requirement because it promoted a particular viewpoint exclusively--one that extolled the benefits of prayer./12

The district court held that such a requirement undermines the concept of viewpoint neutrality because the Village is not acting with indifference to the viewpoints of speakers in its forums, but instead forces those speakers to alter their speech to include viewpoints with which they do not agree. It concluded that this requirement "smacks of government management of speech" and therefore "contradicts the fundamental First Amendment viewpoint neutrality principles by which the Village claims to be abiding." R.66 at 10.

We have noted that the government engages in viewpoint discrimination when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject. See Cornelius, 473 U.S. at 806; see also Rosenberger, 515 U.S. at 835 (noting that the government discriminates based on viewpoint when it examines speech to "determine whether or not [it is] based on some ultimate idea"). In enforcing the "promote or espouse" requirement, the Village has violated the First Amendment's requirement of viewpoint neutrality. It has examined proposed events in a manner that has the effect of disfavoring all individual viewpoints in some way--if a group that has otherwise met the Use Policy's requirements wishes only to espouse its particular viewpoint on a civic issue, that group may not use the Village Hall. In this sense, the Village suppresses the viewpoint of

particular speakers like the plaintiffs and "preclude[s] or punish[es] the expression of particular views," Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 583 (1998), by requiring that a party's civic speech be diluted by forcing the inclusion of all views on that topic. Cf. Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc., 515 U.S. 557, 575-76 (1995) (noting that "the choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control," and "when dissemination of a view contrary to one's own is forced upon a speaker . . . the speaker's right to autonomy over the message is compromised"). As the district court noted, the First Amendment's requirement of viewpoint neutrality emphasizes that the government should be indifferent to a speaker's viewpoint, not that it mandate that "no viewpoint or all viewpoints be expressed." R.66 at 10.

Most frequently, governmental control of freedom of expression involves the government's affirmative act of forbidding expression on a certain subject through censorship. However, as the district court aptly recognized, governmental restraint on freedom of expression "need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers." Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 256 (1974). Indeed, the Supreme Court's First Amendment jurisprudence frequently has recognized that the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714 (1977). Requiring an individual to present a viewpoint not his own is, in terms of the First Amendment values at stake, the equivalent of forbidding him to say what he wishes to say. See Miami Herald, 418 U.S. at 256. The government cannot require an individual to become an "instrument for fostering public adherence to an ideological point of view he finds unacceptable." Wooley, 430 U.S. at 715. Nor can it force a speaker to tailor its speech to an opponent's agenda or respond to an opponent's arguments when it might prefer to be silent. See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n, 475 U.S. 1, 10 (1986) (plurality opinion). Here, the plaintiffs, having

otherwise qualified as a group eligible to use the Village Hall facility for a civic event, cannot be directed by governmental authorities to format their presentation in a way that the government finds suitable. See Hurley, 515 U.S. at 572-75. "[A]ll speech inherently involves choices of what to say and what to leave unsaid . . . ." Pac. Gas & Elec., 475 U.S. at 11 (emphasis in original). Consequently, the speaker has the right to tailor the speech; the one who chooses to speak also chooses what to say. See Hurley, 515 U.S. at 573.

## 2. The "Benefits the Public as a Whole" Requirement

Lastly, the district court determined that the requirement that an event be a civic program or activity that "benefits the public as a whole" was facially unconstitutional because it vested the Village Clerk with unbridled discretion in violation of the Free Speech Clause. "It is well established that where a statute or ordinance vests the government with virtually unlimited authority to grant or deny a permit, that law violates the First Amendment's guarantee of free speech." MacDonald v. City of Chicago, 243 F.3d 1021, 1026 (7th Cir. 2001), petition for cert. filed, 69 U.S.L.W. 3791 (U.S. June 11, 2001) (No. 00-1839). Where virtually unlimited discretion exists, "the possibility is too great that it will be exercised in order to suppress disfavored speech." Id. (quotation marks and citation omitted); see also City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757 (1988).

Any regulations governing a speaker's access to a forum must contain "narrow, objective, and definite standards" to guide a governmental authority, so that such regulations do not operate as a prior restraint that may result in censorship. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969). Although such regulations need not have "perfect clarity and precise guidance," Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989), the Supreme Court has struck down those that do not provide principled limits to guide the decisions of government officials. For example, in Shuttlesworth v. City of Birmingham, 394 U.S. 147 (1969), the Court found that a Birmingham ordinance conferred unbridled

discretion when it required the city commission to issue a parade permit unless in "its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." Shuttlesworth, 394 U.S. at 149-51 (noting that the ordinance made the "peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official" (internal quotation marks and citation omitted)). Additionally, in City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750 (1988), the Court found that an ordinance, which allowed a mayor to deny an application for a permit to place newsracks on public property if he determined it was not "in the public interest" and to condition the permit on terms he deemed "necessary and reasonable," conferred unfettered discretion. Lakewood, 486 U.S. at 769-72 (explaining that to "allow these illusory 'constraints' to constitute the standards necessary to bound a licensor's discretion renders the guarantee against censorship little more than a high-sounding ideal").

We agree with the district court's decision that the "benefits the public as a whole" requirement cannot survive constitutional scrutiny. The Use Policy does not contain any further definition of this phrase to give assistance to the officials who must interpret its meaning. Unlike those regulations that this court has found not to grant unfettered discretion, the Village's requirement provides no concrete standards or guideposts by which Village officials can gauge whether an event satisfies this precondition to the exercise of First Amendment rights./13

Moreover, when asked to explain what this requirement means, the Village has provided confusing and conflicting answers. In its appellate brief, the Village at times suggests that the requirement means the same thing as the "civic program or activity" requirement and is superfluous. At other times it explains that the phrase is a "clarifying limitation" upon the "civic program or activity" requirement, explaining that the use in question must be a civic program or activity that is "broad based and of general public interest." Appellees/Cross-Appellants' Br. at 42-43.

Village Attorney Heise also at times explained that the requirement would be met if an event "related to government" and therefore was civic in nature. R.35, Ex.5 at 55. However, he also stated that Mr. DeBoer's application was rejected under this requirement because it was not civic and because "it appeals to a segment of the population rather than the population generally." Id. at 45-46. Perhaps Village Clerk Sandra Sokol best summed up the confusion over this requirement--when asked its definition, she stated, "Well, if I really knew the answer to that question, if there were an answer to the question, I'd be pretty special." Id., Ex.6 at 50. Ms. Sokol went on to suggest that the requirement would be met if an event were open to everyone--a definition that would make it superfluous to the first prong of the Use Policy, which requires that events be open to all Village citizens. Ms. Sokol later explained that an event does not meet the requirement if "all [view]points are not being shown," id. at 52, a statement that suggests yet another meaning, one that would appear to amount to the same thing as the "promote or espouse" requirement./14

Therefore, the requirement is not given structure or substance by any written standards and its meaning escapes even the Village officials charged with administering and interpreting the Use Policy. Indeed, one Village official essentially admitted that the term was undefinable. It may be, as the Village's brief and Mr. Heise suggested, that the requirement has independent meaning and is used to deny access to civic activities that, in the unfettered judgment of municipal officials, do not appeal to or benefit a significantly large section of the Village's population. It is simply unclear as to how the Village could or would make that determination, one that would by necessity require it to place a particular value on the nature of the speech at issue. As a result, we agree with the district court's opinion that the ambiguity in the "benefits the public as a whole" requirement provides too great a risk that it could be used to engage in prohibited censorship of speech.

Conclusion

For the foregoing reasons, we reverse the district court's decision that the Village did not engage in unconstitutional viewpoint discrimination when it determined that the NDP assembly was not a "civic" event as defined in the Use Policy. However, we affirm the district court's decision that the "promote or espouse" requirement and the "benefits the public as a whole" requirement are unconstitutionally infirm. The plaintiffs may recover their costs in this court.

AFFIRMED in part, REVERSED in part

FOOTNOTES

/1 The Village clerk's office had the responsibility of administering the Use Policy. Village officials explained in detail how this process worked. If an application clearly violated the Use Policy, senior administrative clerk Jan Jankowski or Village Clerk Sandra Sokol would deny that application immediately. If, however, the Village clerk's office had any question as to whether an event met the Use Policy's requirements, Ms. Sokol would confer with the Village's legal department, led by Village Attorney Raymond Heise. Ms. Sokol invariably accepted the legal department's interpretation as to whether a group satisfied the Use Policy's mandates and enforced the policy accordingly. With regard to the plaintiffs' applications to use the Village Hall, Ms. Sokol stated that the decision to deny those applications was made not by her, but by the village president in conjunction with the Village's legal department.

/2 The plaintiffs claim that, although they were allowed to use the Village Hall during these years, they encountered some resistance from village government. They claim that, in 1993, the village manager initially denied their application because the NDP assembly was a "religious" event, but after receiving a letter from plaintiff Martin DeBoer's counsel, eventually allowed them access. Additionally, they claim that, after the 1994 assembly, Ms. Sokol prepared a memorandum stating her objection to the plaintiffs' use of the Village Hall on the same ground.

/3 In his 1997 application, Mr. DeBoer listed the meeting's purpose as "Prayer for community, state, [and] national leaders." R.35, Ex.1, Ex.D. In his 1998 application, Mr. DeBoer listed the meeting's purpose as "Prayer." Id., Ex.1, Ex.F.

/4 The plaintiffs also contest the district court's

decision to grant the motion for reconsideration under Rule 60(b) on the grounds of newly discovered evidence--the transcript of the 1999 NDP assembly. We review a district court's decision to grant or deny a Rule 60(b) motion for abuse of discretion. See Tobel v. City of Hammond, 94 F.3d 360, 362 (7th Cir. 1996). We do not believe the court abused its discretion in considering this new evidence. However, as this opinion will demonstrate, even when taking into account the content of the 1999 NDP assembly, we believe that the plaintiffs have demonstrated that the challenged aspects of the Use Policy violated their constitutional rights. As a result, we shall proceed directly to the merits of those issues.

/5 See, e.g., AETC, 523 U.S. at 679 (noting that "the government creates a designated public forum when it makes its property generally available to a certain class of speakers," but does not "when it does no more than reserve eligibility for access . . . to a particular class of speakers, whose members must then, as individuals, obtain permission to use it") (internal quotation marks and citations omitted); Chicago Acorn v. Metro. Pier & Exposition Auth., 150 F.3d 695, 700 (7th Cir. 1998) (holding that meeting rooms at Chicago's Navy Pier were a nonpublic forum, due to the "[s]electivity and restriction" that informed governmental decisions to rent those rooms to the public).

/6 For example, Village Attorney Heise defined a civic event as one "related to a citizen's relationship with government." R.35, Ex.5 at 41. Village Clerk Sokol defined the term as an event that "has to do with the government and its citizenry." Id., Ex.6 at 44. Jankowski, the senior administrative clerk, defined "civic" as referring "to the relationship between the citizens of Oak Park and the manner in which they are governed." Id., Ex.4 at 32.

/7 The court noted, for example, that the Village's definition of "civic" was in accord with the dictionary definition of that term as meaning "'of, relating to, or belonging to a city, a citizen, or citizenship.'" R.66 at 12 (quoting Webster's II New Riverside University Dictionary (1984)). The court also found that, prior to this litigation, the Village had applied this requirement in line with its stated definition by granting access to candidates' forums for local elections and a congressman's town hall meeting, but denying access to, among others, the Oak Park-River Forest Symphony Orchestra, Ameritech and Dean Witter Investment Services.

/8 More particularly, the court also found that the 1999 NDP assembly itself was non-civic because it

contained a number of hymns, discussion regarding biblical passages and "the church itself" and prayer invoking the names of God and Jesus Christ. R.103 at 7-8.

/9 As to the reasonableness of the "civic program or activity" requirement, the district court found that "[n]o one doubts that limiting the public's use of the Village Hall to programs or activities of a civic character" was a reasonable restriction that the Village was entitled to make. R.66 at 6.

/10 The Court also noted that the school's denial of access to the Club was no different than a university's denial of funding to an otherwise eligible student organization on the ground that the organization published a newspaper from a Christian perspective that challenged Christians to "'live, in word and deed, according to the faith they proclaim and . . . encourage[d] students to consider what a personal relationship with Jesus Christ means.'" Good News Club v. Milford Cent. Sch., 121 S. Ct. 2093, 2101-02 (2001) (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 826 (1995)).

/11 Once it is clear that the use of prayer or biblical instruction does not transform an event whose purpose is focused on civic subject matter into "religious" subject matter, we do not believe that it will be difficult or overly intrusive for the Village to distinguish between civic and non-civic events. To qualify for use of the Village Hall facility, the primary purpose of the event must still be a civic one, as the Village has defined the term. The Village would not engage in viewpoint-based discrimination under its Use Policy if it denied permission to conduct worship services held as part of a faith's regular religious regimen and bearing no relationship to a specific civic purpose. Such services would not be able to meet the Village's requirement that an event have as its primary purpose providing a "civic program or activity." Cf. Good News, 121 S. Ct. at 2103 n.4 (concluding that the Club's activities did not constitute "mere religious worship, divorced from any teaching of moral values [a permissible subject matter in the forum]").

/12 See, e.g., R.35, Ex.5 at 47 (deposition of Raymond Heise) ("Well, they're based on a belief in prayer. They express a . . . viewpoint that espouses prayer, and that is exactly what we're trying to avoid is espousing particular points of view. . . . Prayer, as in praying for government, promotes prayer. It espouses a view in prayer as a value."); id., Ex.6 at 125 (deposition of Sandra Sokol) (answering "Yes" when asked "And is

the way in which [the NDP assembly] failed to meet [the "promote or espouse" requirement] because it promoted or espoused the philosophy of religion?").

/13 See MacDonald v. City of Chicago, 243 F.3d 1021, 1028 (7th Cir. 2001) (holding that unbridled discretion not conferred by Chicago ordinance regarding parade permits, when ordinance required granting of permit unless specifically articulated public safety concerns existed, such as whether parade "unnecessarily interfere[s] with traffic in the area contiguous to the route"), petition for cert. filed, 69 U.S.L.W. 3791 (U.S. June 11, 2001) (No. 00-1839); Graff v. City of Chicago, 9 F.3d 1309, 1317-19 (7th Cir. 1993) (holding that Chicago ordinance regulating whether to grant a license for newsstands did not confer unlimited discretion, when ordinance contained six criteria for making that determination, such as whether "the design, materials and color scheme [of the stand] comport with and enhance the quality and character of the streetscape" or the "extent to which services that would be offered by the newspaper stand are already available in the area" and when the ordinance also allowed for the removal of newsstands that met criteria such as endangering public safety or property, interfering with traffic or interfering with the use of display windows).

/14 Lastly, in seeming contrast to Mr. Heise's explanation that the requirement is not met unless an event appeals to the population generally, Jankowski stated that, in his opinion, the requirement was not concerned with whether there was or would be any public interest in a particular event.